

Court Of Appeals

Fourth Court of Appeals District of Texas
San Antonio

★　★　★　　　　　　　　　　　★　★　★

# OPINION

No. 04-08-00922-CV

Stephanie M. **PHILIPP**, P.A., Robert A. Frolichstein, M.D., and Methodist Healthcare System
of San Antonio, Ltd., L.L.P., d/b/a Southwest Texas Medical Hospital,
Appellants

v.

Jennifer Lynn **MCCREEDY**,
Appellee

From the 45th Judicial District Court, Bexar County, Texas
Trial Court No. 2008-CI-11854
Honorable Karen Pozza, Judge Presiding

Opinion by:　　Catherine Stone, Chief Justice

Sitting:　　　Catherine Stone, Chief Justice
　　　　　　　Phylis J. Speedlin, Justice
　　　　　　　Steven C. Hilbig, Justice

Delivered and Filed:　July 29, 2009

AFFIRMED

　　　　This interlocutory appeal arises from a medical negligence case.  The defendant health care

providers challenge the trial court's denial of motions to dismiss under Chapter 74 of the Texas Civil

Practice and Remedies Code, which provides that parties pursuing medical negligence claims must

file a preliminary expert report outlining the breach of duty and resulting damages that give rise to

the claims. The defendants contend the expert report filed in this case by the plaintiff, Jennifer McCreedy, is inadequate. Indeed, the defendants allege the report is so deficient that it is a "flagrant violation" of the statutory requirements and should result in a rendition of judgment against McCreedy rather than a remand. By contrast, McCreedy contends the report she filed is detailed, complete, and a good faith effort to comply with the dictates of Chapter 74. The trial court acknowledged the ongoing difficulty arising from the requirements of Chapter 74, specifically noting on the record that litigants and attorneys need guidance. In fact, the trial court expressed frustration that the trial courts are merely pawns in the "little game" of expert report litigation. There is no doubt that Chapter 74 has spawned a cottage industry of expert report litigation; this court alone has addressed issues relating to preliminary expert reports under Chapter 74 of the Civil Practice and Remedies Code multiple times within the past year. Once again we address this contentious issue in medical negligence litigation.

## PROCEDURAL AND FACTUAL BACKGROUND

Jennifer McCreedy filed suit against physician assistant Stephanie M. Philipp, Dr. Robert A. Frolichstein, and Methodist Healthcare System of San Antonio, Ltd., L.L.P., d/b/a Southwest Texas Medical Hospital (collectively "Philipp"), alleging medical malpractice in connection with care rendered to her at the Methodist Hospital emergency room. Because this is an interlocutory appeal filed early in the litigation process, the facts have not been established. The following very briefly summarizes the facts as alleged by McCreedy and as recited in her expert's report:

On July 25, 2006, McCreedy injured her ankle and sought treatment in the emergency room at Southwest Texas Methodist Hospital. She was examined by physician's assistant Philipp, who told McCreedy the ankle was broken, and that she would be putting McCreedy into a splint and

sending her home. McCreedy was not seen by an orthopedic specialist or an emergency room physician. With a certain amount of difficulty, Philipp positioned McCreedy's ankle in a splint and instructed McCreedy to make a follow-up appointment with an orthopedic surgeon the next day. At the time of her disposition at 4:14 a.m. on July 26, Philipp diagnosed McCreedy with fractures of the distal tibia and fibula, but no bimalleolar or trimalleolar fracture and no ankle dislocation (her ultimate diagnosis). McCreedy was not given a post-reduction x-ray to ensure reduction had been achieved, nor was she examined for vital signs, and there was no documentation of a neurovascular check of the extremity after splinting. McCreedy left the hospital at approximately 5:00 a.m. on July 26.

On July 26, McCreedy contacted an orthopedic surgeon, Dr. Marvin Brown, and was given his first available appointment on July 27. At that appointment McCreedy was told that surgery could not be safely performed on that day because of extreme swelling. McCreedy's ankle was manipulated back into a reduction and placed in a temporary stabilization boot. Ultimately, surgery was scheduled for August 8, 2006, thirteen days after the initial injury. The surgeon told McCreedy that while he would rather not operate with the excessive swelling, he felt the damage being caused by the delay in getting the ankle permanently reduced outweighed the risk of the swelling. After the surgery, Dr. Brown told McCreedy he was forced to do an Achilles tendon lengthening. In the period following the surgery, Dr. Brown provided McCreedy with the overall care and treatment of a postoperative wound dehiscence, and also diagnosed and treated her for Reflex Sympathetic Dystrophy ("RSD"), a condition producing severe pain to the limb, which developed postoperatively.

McCreedy filed suit against Philipp, Dr. Frolichstein (the emergency physician on duty the night of McCreedy's care), and Methodist Healthcare System of San Antonio, alleging negligence

and gross negligence in the care and treatment of the fracture, and violations under Title 42 of the United States Code relating to the Emergency Medical Treatment and Active Labor Act (EMTALA).[1] McCreedy submitted an expert report prepared by Dr. R. Lee Chilton, III. Philipp responded with a Motion to Dismiss, alleging: (1) Dr. Chilton is not qualified to render an opinion on causation; and (2) the report is conclusory and thus inadequate. The trial court denied Philipp's motion to dismiss. This appeal followed.

### CHAPTER 74 OF THE TEXAS CIVIL PRACTICE & REMEDIES CODE

A plaintiff who brings a health care liability claim is required to file an expert report that contains "a fair summary of the expert's opinions as of the date of the report regarding applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed." *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(r)(6) (Vernon Supp. 2009); *see also Tovar v. Methodist Healthcare Sys. of San Antonio*, 185 S.W.3d 65, 67 (Tex. App.—San Antonio 2005, pet. denied). If, after a hearing, the trial court determines the report does not constitute an objective good faith effort to comply with the statutory requirements, then the court shall dismiss the lawsuit. TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(b)(2). In determining whether the expert report constitutes a good faith effort, we look no further than the report itself. *Am. Transitional Care Ctrs. of Tex. v. Palacios*, 46 S.W.3d 873, 878 (Tex. 2001) (the only information relevant to the inquiry is within "the four corners" of the report). The report need not marshal all of the plaintiff's proof; however, it must include the expert's opinion on each of the elements identified in the statute: standard of care, breach, and causation. *Id.* at 878; *Tovar*, 185

---

[1] On appeal no challenge has been made to the expert report regarding the allegations of EMTALA violations.

S.W.3d at 68. The report need only provide enough information to fulfill two purposes: (1) it "must inform the defendant of the specific conduct the plaintiff has called into question"; and (2) it "must provide a basis for the trial court to conclude that the claims have merit." *Palacios*, 46 S.W.3d at 879. The report can be informal in that the information in the report does not have to meet the same requirement as the evidence offered in a summary judgment proceeding or at trial. *Id.* On the other hand, the expert must explain the basis of his statements to link his conclusions to the facts. *Bowie Mem'l Hosp. v. Wright*, 79 S.W.3d 48, 52 (Tex. 2002).

In accordance with section 74.351, McCreedy served Philipp with an expert report prepared by Dr. Chilton. The trial court considered and overruled Philipp's objections to Dr. Chilton's report, and denied Philipp's motion to dismiss McCreedy's suit. We review the trial court's decision regarding the adequacy of an expert report under an abuse of discretion standard. *Id.* An abuse of discretion occurs when a trial court acts arbitrarily or unreasonably and without reference to any guiding rules or principles. *Id.*

### EXPERT'S QUALIFICATIONS ON CAUSATION

Philipp argues Dr. Chilton is not qualified to render opinions concerning the proximate cause of McCreedy's alleged orthopedic injuries. In order to qualify as an expert witness in a suit against a health care provider, the physician preparing the report must be qualified on the basis of training or experience to offer an expert opinion regarding the accepted standard of medical care for the diagnosis, care, or treatment of the illness, injury, or condition involved in the claim. TEX. CIV. PRAC. & REM. CODE ANN. § 74.402(b) (Vernon 2005). In determining whether a witness is qualified on the basis of training or experience, the trial court must consider whether, at the time the claim arose or at the time the testimony is given, the witness: (1) is board certified or has other substantial

training or experience in an area of medical practice relevant to the claim; and (2) is actively practicing medicine in rendering medical care services relevant to the claim. *Id.* § 74.402(c). In order to qualify as an expert witness on the issue of causation, the physician must be qualified to render opinions on that causal relationship under the Texas Rules of Evidence. *Id.* § 74.403(a) (Vernon 2005). Rule 702 of the Texas Rules of Evidence requires that an expert be qualified by "knowledge, skill, experience, training, or education" and that the testimony "assist the trier of fact." TEX. R. EVID. 702. The qualifications of an expert must appear in the report itself. *Olveda v. Sepulveda*, 141 S.W.3d 679, 683 (Tex. App.—San Antonio 2004), *pet. denied*, 189 S.W.3d 740 (Tex. 2006).

McCreedy brought suit against Philipp and Dr. Frolichstein, both emergency medicine practitioners. Dr. Chilton's report includes a list of his qualifications and experience demonstrating his expertise in the field of emergency medicine. Dr. Chilton received his M.D. in 1990, completed a residence in emergency medicine, and is board certified by the American Board of Emergency Medicine. In addition, he is a Fellow of the American Academy of Emergency Medicine and of the American College of Emergency Physicians. He has served as a Clinical Assistant Professor of emergency medicine, has trained residents in emergency medicine, and is currently the Medical Director of the Emergency Department of a surgical hospital.

Philipp concedes Dr. Chilton's report adequately establishes his credentials to address the standard of care for emergency room treatment. However, she argues the report fails to establish Dr. Chilton is competent to address the causes of the complications sustained by McCreedy following her visit to the emergency room.

The leading case on medical expert qualification, and the case on which Philipp relies, is *Broders v. Heise*, 924 S.W.2d 148 (Tex. 1996). In *Broders,* the Texas Supreme Court considered "whether the trial court abused its discretion in excluding the testimony of an emergency physician that the conduct of the three defendant emergency physicians and the defendant hospital was a cause in fact of a patient's death." *Id.* at 149. The proponents presented the broad argument that "merely because [the witness was] a medical doctor," the witness was qualified to testify about "all medical matters in a suit against a medical doctor." *Id.* at 152. Rejecting that argument, the court explained that "given the increasingly specialized and technical nature of medicine, there is no validity, if there ever was, to the notion that every licensed medical doctor should be automatically qualified to testify as an expert on every medical question." *Id.* The court further stated that the proponent must "establish that the expert has 'knowledge, skill, experience, training, or education' regarding the specific issue before the court which would qualify the expert to give an opinion on that particular subject." *Id.* at 153. Given the facts in *Broders*, the court determined that the proponents "simply did not establish that [the witness's] opinions on cause in fact would have risen above mere speculation to offer genuine assistance to the jury." *Id.*

Philipp acknowledges that in some instances a doctor trained in one specialty may prove qualified to testify on a medical matter outside his specific area of practice. *See id.* at 153-54. Philipp argues, however, that Dr. Chilton's expert report and attached curriculum vitae fail to establish his qualifications to opine about the cause in fact of McCreedy's orthopedic injury. As stated by Philipp, "[a]ll of the injuries and damages sustained by Plaintiff are alleged to be as a result of Plaintiff being seen by an orthopedic surgeon on July 27, 2006, rather than being evaluated in the emergency room. The damages alleged are complications of treatment by an orthopedic surgeon."

We believe that Philipp frames the issue far too narrowly. McCreedy's suit is about allegedly negligent emergency room treatment of an orthopedic injury and the complications that followed the negligent emergency room treatment. Based upon a fair reading of McCreedy's petition, the injury or condition at issue in this suit arises from McCreedy's presentation at the emergency room with a significant ankle fracture and her subsequent discharge from the emergency room with an unstable trimalleolar fracture of the left ankle. For example, the petition criticizes the emergency room personnel for improperly treating McCreedy's fracture, failing to perform a reduction of the ankle in a manner that would ensure the reduction was maintained, failing to obtain a post reduction x-ray, and discharging McCreedy in an unstable condition. *See Mosely v. Mundine*, 249 S.W.3d 775, 779 (Tex. App.–Dallas 2008, no pet.) (holding internist practicing as urgent medical care provider qualified to opine on ability of emergency room doctor to interpret routine chest x-ray that revealed a cancerous abnormality; noting the conduct at issue arose from failure to interpret routine chest x-ray, not the diagnosis and treatment of cancer).

While Dr. Chilton's curriculum vitae does not reflect any specific orthopedic training or experience, his expert report includes numerous statements related to his qualifications regarding treatment of McCreedy's orthopedic injury:

> I have extensive experience in the evaluation, management and treatment of orthopedic injuries such as that experienced by Ms. McCreedy . . . specifically, a trimalleolar fracture of the left ankle. Based upon my knowledge, training and experience I am familiar with the standard of care applicable to the care of the injury suffered by Ms. McCreedy including the evaluation, management and treatment of such condition in an emergency room setting and outside of an emergency room setting, the need for and timing of consultations with other specialists and the need for and the timing of surgical treatment of such a fracture, and the ultimate diagnosis and proper disposition of the patient.

***

> I am familiar with the accepted standard of care for the emergent evaluation, management and treatment of conditions like or similar to those experienced by Jennifer McCreedy, including but not limited to trimalleolar fracture of the ankle with and without dislocation, the timing of orthopedic consultation for such fractures, the timing of surgical correction of such fractures, the reductions of such a fractures [sic], the proper use of x-ray examinations in assessing fracture reduction, and the complications of such fractures including but not limited to wound and tissue swelling, and wound infection. I am also familiar with the standards of care for hospitals, nursing staff, physician extenders, such as physician assistants, and physicians practicing in the ER setting, caring for injuries such as the one suffered by Jennifer McCreedy, in the evaluation and management of such fractures in the ER setting with respect to such things as fracture diagnosis and management, proper evaluation of pain status, proper emergent reduction of fractures and dislocations, proper evaluation of stability, and proper use of medications for pain control, proper discharge instructions and discharge management, proper use of orthopedic consultants in the ER, and proper clinical assessment prior to discharge. I am also familiar with the complications of such a fracture including but not limited to wound and tissue swelling, tissue necrosis, and wound infection.

We note that in *Broders*, the emergency medicine doctor found unqualified never testified that he knew, from either experience or study, the effectiveness of the various treatments available for the head injury at issue. *See Roberts v. Williamson*, 111 S.W.3d 113, 121 (Tex. 2003) (noting that in the *Broders* case the emergency room doctor never testified that he knew, from either experience or study, the effectiveness of the particular treatments in general, and that the test was whether the offering party established the expert had knowledge, skill, experience, training, or education regarding the specific issue before the court which would qualify the expert to give an opinion on that particular subject). By contrast, in his expert report, Dr. Chilton specifically set forth that he has education, training, and experience in the evaluation, management, and treatment of a trimalleolar ankle fracture with dislocation, not only in an emergency room setting, but also outside the emergency room. *See id.* at 121-22 (court finds a board-certified pediatrician qualified to testify on neurological issues sustained by a newborn, where the pediatrician established training, study,

and experience in pediatric neurological injuries within the expert report). Additionally, Dr. Chilton stated he is familiar with the effectiveness of appropriate treatment and with the complications that can occur if such an ankle fracture is not treated correctly.

At the time the claim arose and at the time his report was filed, Dr. Chilton had substantial training and experience in emergency medicine, including orthopedic injuries commonly seen in relation to emergency medicine, and was actively practicing medicine in rendering medical care services relevant to the claim. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.402(c). In addition, Dr. Chilton testified within the confines of his report that he has knowledge, training, and experience in the evaluation, management, and treatment of orthopedic injuries such as that experienced by McCreedy. *See* TEX. R. EVID. 702; *Olveda*, 141 S.W.3d at 683. As attested by Dr. Chilton, emergency room physicians are trained to manage complications that flow from treatment of injuries such as those experienced by McCreedy. *Cf. Sloman-Moll v. Chavez*, No. 04-06-00589-CV, 2007 WL 595134, *4 (Tex. App.—San Antonio 2007, pet. denied) (mem. op.) ("It is axiomatic that a physician trained to perform surgery is also trained to manage surgical complications . . . . Accordingly, Dr. Alford's expertise as a head and neck surgeon also qualifies him to opine on the cause in fact of postoperative complications that flow from that surgery.").

We thus conclude that Dr. Chilton's qualifications, as set forth in his report and his curriculum vitae, sufficiently qualify him to opine on the proper treatment and care of a trimalleolar fracture and the complications that flow from the failure to properly treat such an orthopedic injury. Therefore, the trial court did not abuse its discretion in finding Dr. Chilton was qualified to testify as to the cause of McCreedy's orthopedic injuries. Philipp's first issue is overruled.

## CONCLUSORY NATURE OF THE EXPERT REPORT

Philipp next argues Dr. Chilton's expert report merely stated his conclusions regarding proximate cause and failed to connect those conclusions to the facts of the case. Philipp contends Dr. Chilton's report contains a series of unsupported and unsubstantiated claims regarding the causation of McCreedy's injuries, and that Dr. Chilton simply repeats several times that all of McCreedy's problems stemmed from the delay in her evaluation by an orthopedic surgeon. We disagree.

Review of the expert report shows Dr. Chilton explained, in great detail, how the deviations in the applicable standards of care proximately caused McCreedy's injuries. Moreover, McCreedy is not simply complaining about the failure to provide an orthopedic consult; she is also alleging negligence in her actual treatment by Philipp at the hospital. Dr. Chilton's report includes the following explanations:

> Defendants' failure to perform the reduction on the ankle in a manner that the reduction was adequately maintained resulted in the reduction failing to hold the ankle in place which caused excessive swelling and recurrent dislocations upon leaving the hospital. The process of the unstable fractured ankle joint becoming dislocated time and again caused harm to the surrounding tissues and swelling which interfered with the ability to perform the open reduction internal fixation surgery on the left trimalleolar fracture of the ankle. This recurrent dislocation of the left ankle required urgent surgical intervention at a time when her ankle was swollen to the point that this contributed to wound healing problems. Had the ankle been reduced and fractures fixated on the night of admission to the Emergency Room at Methodist then the need to cut and lengthen her Achilles tendon to reduce her ankle joint would not have been required. An earlier surgery would have avoided cutting of the Achilles tendon with all of the wound healing problems that presented, also would have occurred at a time when Ms. McCreedy's soft tissues were in a better condition. Cutting through the resulting swollen tissues and the required lengthening of the Achilles tendon proximately caused wound healing problems including wound dehiscence and ultimately RSD. The failure to perform, verify and maintain the reduction in a manner that it held proximately caused pain, suffering, medical expense and impairment . . . .

Defendants' failure to obtain a post reduction x-ray to assure that a reduction had been obtained was substantially below the standard of care and it resulted in Ms. McCreedy being discharged from the hospital without the assurance that the reduction was obtained and that the fractured ankle was stable . . . . The failure to obtain the post-reduction x-ray and the discharge that was therefore allowed to take place resulted in the ankle becoming dislocated time and again and caused harm to the surrounding tissues and swelling which interfered with the ability to perform the open reduction internal fixation surgery on the left trimalleolar fracture of the ankle. This recurrent dislocation of the left ankle required urgent surgical intervention at a time when her ankle was swollen to the point that this contributed to wound healing problems . . . . an earlier surgery, which would have clearly been indicated by inadequate reduction on a post-reduction x-ray, in addition to not requiring the cutting of the Achilles tendon with all of the wound healing problems that presented, also would have occurred at a time when Ms. McCreedy's soft tissues were in a better condition . . . .

***

The delay in the definitive orthopedic evaluation, reduction, and urgent surgical fixation of her injures result[ed] in a substantial amount of swelling and recurrent slippage of the fracture reductions. This created the need for an untimely surgery that had to incise the swollen and damaged tissues as well as the Achilles tendon. All of this would have been avoided by immediate admission to the hospital with urgent open reduction and internal fixation surgery on the left trimalleolar fracture of the ankle for Ms. McCreedy.

Even if some of the causation statements in the report appear conclusory when read in isolation, the trial court was entitled to read the causation section in the context of the entire report. *See Benavides v. Garcia*, 278 S.W.3d 794, 799 (Tex. App.—San Antonio 2009, pet. filed) (holding that when read in context of entire report, causation section of expert medical report was not conclusory). Dr. Chilton's report discusses with adequate specificity the standards of care, breaches of those standards, and causation such that it "informs the defendant of the conduct the plaintiff has called into question and . . . provide[s] a basis for the trial court to conclude that the claims have merit." *See Palacios*, 46 S.W.3d at 879. At this juncture of the litigation, that is all that is required. Consequently, Philipp's second issue is overruled.

## CONCLUSION

We conclude that Dr. Chilton's report and curriculum vitae demonstrate his qualifications to opine on the claim at issue in this case – a claim of negligent emergency room treatment of a significant ankle fracture. Additionally, Dr. Chilton's report adequately links his determinations regarding the alleged breach of the standard of care to the resulting damages. Accordingly, the trial court did not abuse its discretion in denying Philipp's motion to dismiss, and the trial court's order is affirmed.

Catherine Stone, Chief Justice